551 F.Supp. 688 (1982)
AMERICAN RAILWAY & AIRWAY SUPERVISORS ASSOCIATION, et al., Petitioners,
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Respondent,
and
Consolidated Rail Corporation, Rule 19 Party.
Civ. A. No. 82-24.
Special Court, Regional Rail Reorganization Act.
November 30, 1982.
*689 James L. Highsaw, William G. Mahoney, Clinton J. Miller, III, John J. Sullivan, Highsaw & Mahoney, P.C., Washington, D.C., for petitioners Non-Operating Craft Unions.
Alan J. Davis, Mark L. Alderman, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa. (John Markle, Jr., Robert H. Young, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., of counsel), for respondent Southeastern Pennsylvania Transp. Authority.
Dennis Alan Arouca, David S. Fortney, Consolidated Rail Corp., Philadelphia, Pa. and Harry A. Rissetto, John A. Fraser, Morgan, Lewis & Bockius, Washington, D.C., for Rule 19 Party Consolidated Rail Corp.
Before GASCH, P.J., and BRYANT and WEINER, JJ.

MEMORANDUM
GASCH, Presiding Judge:
This case is before the Court on the petition of various non-operating railroad craft unions for review of an arbitrator's award made on October 10, 1982 by Neutral Referee Francis X. Quinn pursuant to Section 508 of the Rail Passenger Service Act (RPSA) as amended by the Northeast Rail Service Act of 1981 (NRSA), Pub.L.No. 97-35 (August 13, 1981), 45 U.S.C. § 588. This Court has jurisdiction over this matter pursuant to Section 1152 of NRSA. Oral argument was heard on November 22, 1982. For the reasons stated below, the unions' petition for review and enforcement is hereby dismissed.

BACKGROUND
The petitioners in this case are railroad labor organizations representing certain crafts and classes of non-operating employees currently employed by the Consolidated Rail Corporation (Conrail) in Pennsylvania. Each of these organizations has members who are subject to possible transfer to the Southeastern Pennsylvania Transportation Authority (SEPTA) on January 1, 1983. SEPTA is a "commuter authority" as defined in Section 1135(a)(3) of NRSA and is currently in the process of assuming Conrail's commuter rail operations in Pennsylvania.
This litigation has been brought by the unions to challenge an arbitrator's award made pursuant to Section 508(d) of the RPSA. In New Jersey Transit Rail Operations, Inc. v. International Brotherhood of Boilermakers, et al., (NJT), 550 F.Supp. 1327 (1982), this Court recently addressed and upheld another arbitrator's award issued pursuant to this section. In that memorandum we fully discussed the statutes and procedures which must be followed during the process by which commuter obligations are transferred from Conrail to the various commuter authorities. These topics are briefly discussed once again.
In the past, Conrail has provided commuter service to the area under a subsidy arrangement with SEPTA as provided by Section 304 of the Regional Rail Reorganization Act of 1973. Section 1136 of NRSA provides for the termination of Conrail's commuter obligations on January 1, 1983. As of that date, SEPTA will become the operator of these lines. Before SEPTA can fully assume this massive operation, it must comply with the transfer scheme as envisioned by Congress in Sections 508 through 510 of the RPSA. These sections prescribe the methods by which Conrail employees are to be absorbed by Conrail's successors. Aside from the NJT case, these sections have been the subject of extensive litigation in the Special Court. See Railway *690 Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA I), 534 F.Supp. 832, cert. denied, ___ U.S. ___, 102 S.Ct. 2271, 73 L.Ed.2d 1285 (1982); Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA II), 534 F.Supp. 852 (1982); International Brotherhood of Teamsters v. Southeastern Pennsylvania Transportation Authority (SEPTA III), 539 F.Supp. 1222 (1982); Railway Labor Executives' Association v. Southeastern Pennsylvania Transportation Authority (SEPTA IV), 547 F.Supp. 884 (1982).
Sections 508, 509, and 510 of the RPSA were enacted by Congress to provide a methodology for this transfer of commuter service. The initial step in the employee transfer process is covered by Section 508 which is entitled "Transfer of Employees." In order to begin the process the parties are required to enter into an implementing agreement. Section 508, in subsections (c)(1) through (c)(7), sets forth the elements which are to be included in the final agreement. These subsections cover such variables as the number of employees to be transferred, the specific employees to be transferred, the procedures by which employees may elect to accept jobs, the procedure for acceptance of these employees and the procedure for determining seniority. All the parties to this litigation agree that the Section 508 process is merely a preliminary step in the transfer process. Its main purpose is to create a roster from which Conrail employees may move over to the new commuter authority.
Collective bargaining is to take place pursuant to subsections (a) through (h) of Section 510. This section is unique because it provides for the ultimate abrogation of existing Conrail collective bargaining agreements. Section 510(a)(1) contemplates that the unions and management will enter into new collective bargaining agreements with respect to pay, rules, and working conditions after the implementing agreements have been negotiated under Section 508. Section 510(h) requires that any disputes which arise during this new collective bargaining phase of the transfer be resolved in accordance with that section.
Pursuant to Section 508(a), representatives of SEPTA, Conrail and the non-operating unions commenced negotiations in an attempt to reach an implementing agreement to govern the transfer of Conrail's employees. Despite three months of negotiations, the parties failed to reach an agreement. The parties were also unable to select a neutral referee pursuant to Section 508(d)(1). Accordingly, on September 14, 1982 the National Mediation Board appointed Dr. Quinn to conduct the arbitration of this dispute. The proceedings before Dr. Quinn commenced on September 22 and, after consideration of extensive written presentations and two oral arguments, he issued his award on October 10.
This award adopted the implementing agreement entered into in New York State between the labor organizations and Metro-North Commuter Rail Division, with two important modifications. Dr. Quinn stated that SEPTA should advertise its proposed positions rather than the Conrail job descriptions as the unions and Conrail had urged him to do. In addition, he determined that all current Conrail employees who wished to apply for jobs with SEPTA must authorize the transfer of a copy of his Conrail employment records and must pass reasonable job related screening tests. At a meeting between the parties held on October 10, language was added to the award at the request of the unions providing that the SEPTA job bulletins should identify the Conrail craft or class eligible to bid for a particular position.
Pursuant to the Quinn award, the number of SEPTA positions advertised will be equal to the number of positions in commuter service within the SEPTA region as of October 1, 1982. SEPTA will post its positions on December 1, 1982. Transfer of employees will be effective as of January 1, 1983, pending the outcome of the Section 510 collective bargaining process.
In this case, the Court is confronted with a challenge to the arbitrator's award by the unions. In their petition for review the *691 unions claim that Dr. Quinn exceeded his jurisdiction in making this award. They claim that he has allowed SEPTA to change existing crafts and classes  something which this Court explicitly stated in NJT to be beyond a neutral referee's jurisdiction under Section 508. They also contend that the portion of Quinn's award which allows the administration of job-related testing and transfer of employment records is beyond his jurisdiction because it infringes on the Section 510 collective bargaining process. Finally, although it was not actually discussed during oral argument, the unions believe that if this award is valid, SEPTA is not fully complying with its terms.

DISCUSSION

A. The Standard of Review

Once again, there is no dispute among the parties that in order to overturn an arbitrator's award, petitioner must meet a heavy burden of proof. Section 508(d)(3) requires that such an award be "final and binding to the same extent as an award of an adjustment board under section 3 of the Railway Labor Act." Judicial review under that act is extremely limited. As we stated in NJT, there must be a showing either that the arbitrator failed to comply with the statute's requirements, failed to act within his jurisdiction, or acted corruptly. NJT, mem. at 1329; see, Union Pacific Railroad Company v. Sheehan, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 reh. den., 439 U.S. 1135, 99 S.Ct. 1060, 59 L.Ed.2d 98 (1978); Air Line Pilots Association v. Eastern Air Lines, Inc., 632 F.2d 1321, 1323 (5th Cir.1980); Brotherhood of Railroad Trainmen v. Central of Georgia Railway Company, 415 F.2d 403, 415 (5th Cir.1969). Petitioners' only claim is that Quinn has exceeded his jurisdiction. We hold, however, that he has acted in compliance with the statute's requirements.

B. The Unions' Challenges to the Referee's Award

This litigation specifically involves subsections (c)(3) and (c)(4) of Section 508. These subsections provide that implementing agreement negotiations shall
(3) determine the procedure by which such employees may elect to accept employment with Amtrak Commuter or a commuter authority;
(4) determine the procedure for acceptance of such employees into employment with Amtrak Commuter or a commuter authority;
In short, SEPTA contends that Quinn acted within the confines of these two sections when he made his award. The unions, however, believe that Quinn's actions exceeded his statutory authority under subsections (c)(3) and (c)(4) and that he made certain decisions which should only be made during collective bargaining. Because of the unique nature of Sections 508 and 510, considerable litigation has arisen concerning the arbitrator's jurisdiction under Section 508. Problems occur partly because the implementing agreement must be reached before new collective bargaining agreements are fully negotiated. Under these circumstances, it would be very difficult for an implementing agreement to totally avoid addressing some issues that are later subject to change during bargaining under Section 510.
As stated earlier, the unions' first contention is that the referee exceeded his jurisdiction by requiring the posting of jobs to be made in accordance with SEPTA's job descriptions, wage rates, and days off. They base this claim on this Court's opinion in NJT. In the major portion of that decision we held that an arbitrator does not have the jurisdiction to consider, during the Section 508 implementing agreement process, changes in the crafts and classes of Conrail employees.
The unions claim that Dr. Quinn has permitted such a change in crafts and classes in his award. If this were true, then, clearly, his award would have to be set aside. However, we feel that Dr. Quinn, by permitting the use of SEPTA's proposed job descriptions, has not effected such a change and has acted within his jurisdiction as permitted by statute.
*692 Under the terms of the Quinn award, SEPTA is entitled to post positions according to its own job descriptions. This is quite different from the Kasher award in NJT, where posting of jobs was done in accordance with existing Conrail collective bargaining agreements. The unions have provided the Court with two major examples of why they feel that this is tantamount to a change in the current crafts and classes. Neither of these hypothetical situations convinces the Court that such a change has occurred. Petitioners' first argument is that within the Conrail signalman craft or class, there are eleven classifications of work under existing Conrail collective bargaining agreements. SEPTA's new job descriptions may result in a compression of these eleven classifications into three classifications if ultimately accepted in the collective bargaining process. The unions incorrectly contend that this proves that the crafts and classes are being changed by the Section 508 award. All that this shows is that SEPTA is attempting to compress the classifications of work within a craft or class. The crafts and classes themselves remain unchanged.
Petitioners' second example of what they contend to be a change in crafts and classes involves a SEPTA job position entitled "Machinists I". Apparently, this job will be advertised across craft lines to several different crafts and classes. Once again, this does not prove that Dr. Quinn has permitted the compression of the crafts and classes. Workers may bid for a job which is not now represented by their present craft or class. This alone, however, does not show that the crafts and classes are being changed at this stage. All that this proves is that employees in one craft may ultimately shift into another.
SEPTA concedes that eventually it does hope to compress the current crafts and classes into a more efficient framework. However, unlike New Jersey Transit, SEPTA is not attempting to achieve this goal at the Section 508 stage of the transfer process. SEPTA's job descriptions will be advertised directly to the existing crafts and classes. As counsel for respondent pointed out, all Conrail employees will be moved over to SEPTA on existing Conrail rosters. These rosters will look precisely like the ones established by Mr. Kasher in the New Jersey Transit award. SEPTA's proposed job descriptions will be, as counsel represents, little more than a solicitation of interest for jobs which will only be effective if the parties agree to them during Section 510 collective bargaining.
Collective bargaining negotiations will proceed along existing craft and class lines and these crafts and classes will be represented by their traditional representatives. In NJT, however, if the actual crafts and classes had been compressed, this new alignment of employees could conceivably have been final. There might have been no one to effectively represent the new crafts and classes at the collective bargaining table during the Section 510 negotiations. Here, despite the fact that traditional Conrail jobs are not being advertised, existing craft and class representatives will continue to represent Conrail's employees and they may be able to negotiate new job positions as a result of collective bargaining.
Thus, the Court does not agree with petitioners' contention at oral argument that SEPTA is trying to achieve through the back door what New Jersey Transit tried unsuccessfully to achieve through the front door. There exists more than just a difference in form between the positions of the two commuter authorities. Indeed, the Court perceives a significant substantive difference between what Mr. Kasher refused to do and what Dr. Quinn agreed to do.
The unions also challenge Dr. Quinn's authority to provide for job-related testing and transfer of employment records from Conrail to SEPTA. This seems to be a relevant exercise of the referee's authority under Section 508(c)(4). This section allows the referee to determine the procedure for acceptance of the transferred employees. The Court cannot conceive of a more rational procedure for properly fulfilling the requirements of this section. While it is true that such a determination may impinge *693 on the Section 510 collective bargaining process, it is also within the referee's authority under Section 508(c)(4). Therefore, if Section 508 is to have any meaning whatsoever, certain things may be resolved, at least preliminarily, during negotiations and arbitration. Dr. Quinn's procedures for acceptance of employees are not permanent and are still subject to change during collective bargaining. It should be noted that Mr. Kasher, in the New Jersey Transit arbitration, felt that he had the jurisdiction to order the transfer of personnel records, and this Court upheld all portions of that award.
Thus, the Court holds that Dr. Quinn did not act beyond his jurisdiction in making any part of this award. Therefore, the petition for review is hereby dismissed. In addition, petitioners claimed in Count I of their petition that SEPTA has failed to comply with paragraph I of the award since SEPTA "does not intend to advertise for bid" the requisite number of commuter service positions. This claim for enforcement is purely speculative at this point. SEPTA denies that it is not complying with the award and the unions are only predicting what SEPTA intends to do in the future. Therefore, the petition for enforcement of the award is also hereby dismissed.